## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

JAMES LOSAPIO, JR.,                        )
and KATHLEEN B. LOSAPIO, PAUL              )
BIEWALD, individually and on behalf of     )
similarly situated individuals,            )
                                           )     Civil Action No. 3:22-cv-00072
         *Plaintiffs*,                     )
                                           )     Judge Eli J. Richardson
                      vs.                  )
                                           )     Magistrate Judge Alistair Newbern
NISSAN NORTH AMERICA, INC., a              )
California corporation,                    )
                                           )
         *Defendant.*                      )     **JURY TRIAL DEMANDED**
_____    )

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, James Losapio, Jr., Kathleen B. Losapio (the "Losapio Plaintiffs"), and Paul Biewald, by and through their attorneys, bring this Class Action Complaint on behalf of themselves and other consumers who purchased or leased model year 2016-2019 Nissan Titan vehicles ("Class Vehicles") manufactured by Nissan North America, Inc. ("Defendant" or "Nissan"), that suffer from serious defects in the vehicles' manufacturing, design and/or assembly, which have caused the Class Vehicles' engines to fail, prevented the Class Vehicles from starting, impeded the normal operation of the Class Vehicles, and posed a safety risk to their drivers. Plaintiffs, on behalf of themselves and a class of similarly situated individuals, seek damages and all other available relief for Defendant's wrongful conduct. Plaintiffs allege as follows based on personal knowledge as to their own experiences, and as to all other matters, upon information and belief, including an investigation conducted by their attorneys.

## NATURE OF THE ACTION

1.     This case concerns Defendant's manufacturing and sale of Nissan Titan vehicles containing a number of dangerous defects. First, Defendant's 2016-2019 Nissan Titans equipped with Cummins 5.0-liter diesel engines feature a Diesel Exhaust Fluid (DEF) filler tube located directly adjacent to the fuel filler tube. The misplacement of the DEF filler tube can be catastrophic for the vehicles because if DEF contaminates the fuel system it can cause irreparable engine damage that necessitates thousands of dollars in repairs (the "DEF Filler Defect"). Second, Defendant's 2016-2019 Nissan Titans equipped with Cummins 5.0-liter diesel engines suffer from a defective exhaust system and/or HVAC system that allows diesel exhaust fumes to enter the passenger cabin of the vehicles (the "Diesel Fume Defect"). Third, Defendant's 2016-2019 Nissan Titans equipped with Cummins 5.0-liter diesel engines suffer from a defective DEF system that prematurely fails and causes the engine to immediately go into "limp mode" that requires thousands of dollars to repair and creates a dangerous situation by making the vehicle dramatically slow down in the middle of operation.

2.     Like the other members of the putative Class and Subclasses, the Losapio Plaintiffs purchased a 2017 Nissan Titan with the Cummins 5.0-liter diesel engine. After driving their vehicle for less than 4 years and for fewer than 16,000 miles, Plaintiffs' 2017 Nissan Titan's fuel system was contaminated with DEF due to misplacement of the DEF fluid into the diesel fuel filler located directly adjacent to the DEF fuel filler. In addition, Defendant's fuel tank sensor failed to detect the presence of the DEF fluid in the fuel tank until permanent damage had occurred to Plaintiffs' vehicle. As a result, due to the DEF Filler Defect, Plaintiffs' vehicle requires over $23,000.00 in repairs. Additionally, during the time that Plaintiffs have owned their vehicle,

2

Plaintiffs have on numerous occasions experienced exhaust and/or diesel fuel fumes entering the passenger cabin, which Defendant failed to find a cause for or fix.

3.  Similarly, in 2019 Plaintiff Biewald purchased a certified pre-owned 2016 Nissan with the Cummins 5.0-liter diesel engine that had less than 50,000 miles at the time of purchase. After driving his vehicle for just two years, in 2021 at just 88,000 miles the DEF system in Plaintiff Biewald's Nissan Titan failed, causing his vehicle to immediately go into "limp mode" and slow down. As a result of the DEF System Defect Plaintiff Biewald's vehicle requires over $9,000.00 in repairs and is inoperable. Additionally, during the time that Plaintiff Biewald has owned his vehicle, Plaintiff has on numerous occasions experienced exhaust and/or diesel fuel fumes entering the passenger cabin, which Defendant failed to find a cause for or fix.

4.  Consumers nationwide have complained of the exact same DEF filling system flaws, diesel fume problems, DEF system failures, and the accompanying safety risks, but Defendant has failed to implement a recall, remedy the DEF Filler Defect, remedy the Diesel Fume Defect, remedy the DEF System Defect, or provide adequate repairs.

5.  As a result of Defendant's wrongful conduct as described herein, owners and lessees of 2016-2019 Nissan Titans have suffered damages, including, *inter alia*, (1) overpayment for their vehicles, (2) increased service visits, (3) fuel system damage, (4) costs for future repairs; and/or (5) diminished value of their vehicles.

## JURISDICTION AND VENUE

6.  This Court has diversity jurisdiction under 28 U.S.C. § 1332(d), because (i) at least one member of the putative class is a citizen of a state different from any Defendant, (ii) the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to the instant action.

3

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because Defendant transacts business in this District and has its corporate headquarters in this District.

## PARTIES

8.      Plaintiffs James Losapio, Jr., and Kathleen B. Losapio are citizens of the state of Texas. On December 26, 2017, Mr. and Mrs. Losapio purchased a new 2017 Nissan Titan with a Cummins 5.0-liter diesel engine from Fenton Nissan of Rockwall, located in Rockwall, Texas.

9.      Plaintiff Paul Biewald is a citizen of the state of Maine. In or about September 2019 Mr. Biewald purchased a certified pre-owned 2016 Nissan Titan with a Cummins 5.0-liter diesel engine from Marc Motors Nissan, located in Sanford, Maine.

10.     Defendant is a California corporation with its principal place of business in Franklin, Tennessee. Defendant is the North American subsidiary of Nissan Motor Co. Defendant designed, manufactured, marketed, distributed, leased, and sold, through its authorized dealers and distributors, the Class Vehicles in the United States to Plaintiffs and the other members of the Class and Subclasses. Defendant designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles (as hereinafter defined), throughout the United States, including in this District. Defendant is the warrantor and distributor and/or seller of the Class Vehicles in the United States.

## FACTUAL BACKGROUND

### I.      The DEF Filler Defect

11.     Defendant's Nissan Titan is a popular pickup truck sold throughout the United States and its territories, with more than 50,000 vehicles sold in 2017 alone.

12.     For its model years 2016 through 2019 Nissan Titans, Nissan offered the Titan with a Cummins 5.0-liter diesel engine. As with most modern diesel vehicles, to meet current EPA

emissions standards, Defendant's Titan vehicles equipped with the diesel engine utilize a system that injects a fluid known as Diesel Exhaust Fluid ("DEF") into the vehicle's exhaust stream.

13.     DEF consists of a mix of de-ionized water and urea, which reacts with the hot exhaust gases to reduce nitrogen oxide emissions in diesel engines. However, DEF should never be mixed with the diesel fuel because contamination with DEF can cause permanent damage to the engine's fuel system. DEF contamination is known to cause damage sufficient to warrant the complete replacement of costly fuel system components, as outlined in a 2018 NHTSA service bulletin for the 2016-2019 Titan XD.[1]

**Fuel System Components That MUST Be Replaced If DEF Contamination Is Found:**

- 8 Fuel Injectors
- 8 High Pressure Fuel Rail To Injector Supply Lines
- High Pressure Fuel Pump To Fuel Rail Supply Line
- High Pressure Fuel Rail To Fuel Rail Supply Lines
- High Pressure Fuel Pump
- Left Bank Fuel Rail
- Right Bank Fuel Rail
- Return Line From Left Bank Rail To Stage 2 Fuel Filter
- Fuel Injector Return Line
- Supply Line From Stage 2 Fuel Filter To High Pressure Pump
- Drain Line From High Pressure Pump To Stage 2 Fuel Filter
- Stage 2 Fuel Filter Module
- Stage 1 Fuel Filter Module (Contains Electric Lift Pump)
- Supply Line From Stage 1 To Stage 2
- Return Line From Stage 2 To Stage 1
- Supply Line From Tank To Stage 1
- Return Line From Stage 1 To Fuel Tank
- Fuel Tank
- Fuel Level Sensor Unit
- Fuel Filler Tube
- Fuel Filler Hose

14.     Unlike the filler tube for other vehicle fluids that could damage the fuel system if inadvertently introduced into the fuel tank, the DEF filler tube is located adjacent to, and inches from, the fuel filler tube and under the same door. Page 4-3 of the Titan Owner's Manual illustrates the proximity of the DEF filler tube to the fuel filler tube.

---

[1] *See* Exhibit A, Nissan Technical Bulletin NTB16-125a.



15. As shown below in a Nissan Service Bulletin, Nissan has designed the mouth of the DEF tube to be smaller than that of the diesel fuel tube to help prevent the inadvertent introduction of fuel to the DEF system.



Figure 1

16.     But the larger size of the fuel filler mouth does not prevent a person from inadvertently adding DEF to the fuel tank, a mistake that can cause thousands of dollars of damage from just a single mistake.

17.     Despite the fact that adding DEF to the fuel tank is known to cause catastrophic damage to the fuel system of its trucks, and that Nissan's flawed design of its DEF and fuel filler system increases the likelihood that consumers will inadvertently add DEF to their fuel tanks, Nissan has failed to remedy this design flaw.

18.     Numerous online complaints indicate that fuel contamination with DEF is a widespread problem among Nissan Titan owners.





**tp95**
Registered User

Joined Sep 14, 2016
5 Posts

✔ Discussion Starter · #1 · Sep 9, 2018 ⋮

Hey all,
By mistake I put DEF fluid in my diesel tank. I know! I know! but in my defense there was this really good looking women at the pump beside me and I got distracted!

Anyway, I started the truck and immediately the warning of water in the tank came on and the truck went into reduced power. I immediately shut it off and called a tow truck to the dealer. It's there now. From doing searches on the net this actually does happen often, but would like to know if any other members went through this and what did the dealership have to do ie: what is the recommended procedure. I would like to get as much info before I go to the dealership and they say I have to replace this and that. Fords they say replace all the fuel system components down through the injectors with a bill of 22k. Thats right 22k. Others replace the tank, fuel filters, flush the lines with a bill of approx 2k.

thanks in advance!

💬 Reply                     🔖 Save  ⋘ Share



**Tracy**
Registered User

Joined Sep 8, 2018
4 Posts

#7 · Sep 12, 2018                     ⋮

I am a mechanic at Nissan dealer and we have seen it 2 times so far

💬 Reply                     🔖 Save  ⋘ Share



19.     These posts are just a sample of identical complaints regarding 2016-2019 Nissan Titans equipped with the 5.0-liter diesel engine on a single online forum. Further, there are numerous other websites where Titan owners have voiced the same complaints about inadvertent fuel contamination.

20.     As outlined in Nissan's technical service bulletin related to the issue, problems associated with DEF fuel contamination include, but are not limited to failure to start, difficulty starting, rough idle, reduced power, and other problems as discussed herein.

21.     The DEF Filler Defect is a substantial safety concern because it can result in engine failure that cannot be reasonably anticipated or predicted while the vehicle is in operation. In particular, the DEF Filler Defect can result in:

a.      Sudden engine shutoff resulting in loss of power, loss of braking, and inability to adequately maneuver in high-speed or congested driving situations;

b.      Driver distraction due to sudden and unexpected engine shutoff, caused by sudden loss of power, illumination of warning lights and sounds, and loss or diminution of power brake assist;

c.      Loss of maneuverability in high-speed or congested driving conditions due to unexpected loss of engine power—even when the engine does not shut off;

d.      Unexpected vehicle stalling when the vehicle comes to a stop in traffic, thereby endangering vehicle occupants by substantially increasing the risk that other vehicles will hit the Class Vehicles that have stalled unexpectedly; and

e.      Engine shutoff, failure (or seizure), or stalling that strands vehicle occupants in remote, extreme, or unsafe locations or weather conditions.

22.     Defendant is aware of the dangers posed by fuel contaminated with DEF. In 2018, Defendant issued a service bulletin detailing the severity of the effects of DEF contamination. In its notice to its authorized dealers, Defendant made clear: "Putting Diesel Exhaust Fluid (DEF) into the diesel fuel system will contaminate the entire system causing permanent damage to system components. DEF contamination requires replacement of the complete diesel fuel system."

23.     Nonetheless, even while faced with hundreds of complaints by 2016-2019 Nissan Titan owners about DEF contamination, Defendant has refused to provide a remedy, even when consumers have sought warranty repairs.

## II.      The Defective Exhaust/HVAC System

24.      In addition to the defective DEF filler design, the Class Vehicles suffer from a defect in their exhaust systems and/or HVAC systems that causes diesel exhaust fumes to enter the passenger cabin. By designing, manufacturing, assembling, inspecting, distributing, selling and leasing the Class Vehicles with the Diesel Fume Defect, Nissan rendered the Class Vehicles defective and unsafe for their intended use and purpose.

25.      Upon information and belief, the Diesel Fume Defect was caused by Nissan's design, manufacture, and assembly of the Class Vehicles' exhaust and/or HVAC systems which allow exhaust fumes to enter and accumulate in the passenger cabin.

26.      According to the Occupational Safety and Health Administration diesel exhaust is a mixture of particulates that can cause a variety of health issues from "irritation of the eyes and nose, headaches and nausea, to respiratory disease and lung cancer."[2]

27.      The American Cancer Society also recognizes the potential carcinogenic properties of exposure to diesel exhaust.[3]

28.      Critically, as evidenced by the below complaints made with the NHTSA, Nissan has known since at least 2017 of the presence of diesel exhaust fumes in the passenger compartment of certain Nissan Titan models.

29.      Federal law requires Nissan to monitor defects which can cause a safety issue and report them within five (5) days. Upon information and belief Nissan regularly monitors NHTSA complaints in order to meet its reporting requirements under federal law and was provided knowledge of the defect through these complaints, inter alia.

---

[2] https://www.osha.gov/diesel-exhaust.
[3] https://www.cancer.org/cancer/cancer-causes/diesel-exhaust-and-cancer.html.

30.     Below is a sample of complaints made to the NHTSA:

**2016 NISSAN TITAN XD**

**NHTSA ID Number:** 11205950
**Incident Date** January 1, 2019
**Consumer Location** BROKEN BOW, OK

DIESEL FUMES IN CAB, NISSAN IS AWARE OF PROBLEM BUT WILL NOT FIX DUE TO VEHICLE BEING OUT OF WARRANTY, EVEN EXTENDED WARRANTY WILL NOT COVER PART NEEDED TO KEEP FUMES OUT OF CABIN AREA. THIS IS A MAJOR HAZARDOUS EFFECT, COULD CAUSE CARBON MONOXIDE POISON WHILE DRIVING, OR IN IDLE, CAUSES HEADACHES, NAUSEA, THIS HAPPENS AFTER DRIVING EVEN SHORT DISTANCES AND ESPECIALLY WHEN STOPPING FOR LIGHTS OR STOP SIGNS, EVEN ON INTERSTATES AFTER EXITING,

**2017 NISSAN TITAN XD**

**NHTSA ID Number:** 11072383
**Incident Date** October 17, 2017
**Consumer Location** LAS CRUCES, NM

TL* THE CONTACT OWNS A 2017 NISSAN TITAN. WHILE THE CONTACT WAS DRIVING, THE ODOR OF DIESEL FUMES WAS PRESENT IN THE VEHICLE. THERE WERE NO WARNING INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN TO NISSAN OF LAS CRUCES (1801 S MAIN ST, LAS CRUCES, NM) WHERE THE CAUSE OF THE FAILURE COULD NOT BE DETERMINED. THE VEHICLE WAS REPAIRED, BUT THE ODOR RETURNED. THE MANUFACTURER WAS NOTIFIED. THE VIN WAS UNKNOWN. THE APPROXIMATE FAILURE MILEAGE WAS 600. *TT *TR

**2018 NISSAN TITAN XD**

**NHTSA ID Number:** 11417653
**Incident Date** May 1, 2021
**Consumer Location** ABERDEEN PROVING GROUND, MD

while I'm driving my truck, it has a Cummins Diesel engine, at certain times I guess that the engine goes through a regen process, when it odes this process then the cab is filled with noxious gases. This process last a few minutes and causes you to lower the windows to get rid of the toxic gases. I reported it to my Nissan Dealer twice when I took it in for it's service, they acted like they had never heard about it before and told me that there was no issue with my truck. that I had to drive it more to get it to stop ding it. Is this normal or are we being poisoned or getting cancer from these events?

31.     As shown by the above complaints, Defendant knew, or should have known, that the Diesel Fume Defect and associated safety risk were material to owners and lessees of the Class Vehicles and were not known or reasonably discoverable by Plaintiffs and members of the Class and Subclasses before they purchased or leased Class Vehicles, or before the warranties on their Class Vehicles expired.

32.     Notwithstanding Defendant's exclusive and superior knowledge of the Diesel Fume Defect, Defendant failed to disclose the defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to sell the Class Vehicles. Defendant intentionally concealed the Diesel Fume Defect and associated safety hazard, failed to provide any notice of the defect and associated safety hazard to Plaintiffs and members of the Class and Subclasses, and has failed to recall the vehicles to remedy the defect.

33.     While Nissan has issued at least one TSB (NTB 16-056B) in February 2018 for Nissan Titans with a Cummins 5.0-liter diesel engine that appears to be an attempt to address the Diesel Fume Defect, upon information and belief, Plaintiffs and the other members of the Class and Subclasses were never provided with a copy of the TSB and Defendant has not taken efforts to ensure that the TSB was applied to all of the Class Vehicles.

### III.    The Defective DEF System

34.     Furthermore, the Class Vehicles also suffer from a defect in their DEF system that causes premature failure. By designing, manufacturing, assembling, inspecting, distributing, selling and leasing the Class Vehicles with the DEF System Defect, Nissan rendered the Class Vehicles defective and unsafe for their intended use and purpose.

13

35.     Upon information and belief, the DEF System Defect is caused by Nissan's design, manufacture, and assembly of the Class Vehicles' DEF System which results in the DEF System prematurely failing.

36.     As explained above, the DEF System is critical to ensuring that the Class Vehicles meet federal emission standards and is a key component that prevents the Class Vehicles from producing significant amounts of pollution that are otherwise produced by diesel engines.

37.     Critically, Nissan has known since at least 2018 of the presence of problems with the DEF System in the Class Vehicles as evidenced by the TSB (NTB17-060b) in February 2018 for Nissan Titans with a Cummins 5.0-liter diesel engine that appears to be an attempt to address DEF System errors due to incorrect DEF sensor readings.

38.     In addition, numerous other owners of the Class Vehicles have made similar complaints involving the DEF System failing, as shown below:

**2016 NISSAN TITAN XD**

**NHTSA ID Number:** 11382824
**Incident Date** November 30, 2020
**Consumer Location** TAYLORSVILLE, KY

IMMEDIATE RECALL NEEDED ON ALL NISSAN TITANS WITH LIMP MODE FOR DEF EXPIRATION. DEADLY CONSEQUENCES POSSIBLE AND NOT AVOIDABLE. I HAVE RECENTLY DISCOVERED THAT THE TITAN IS A DEADLY VEHICLE IN SEVERAL WAYS. MOST RECENTLY I DISCOVERED THE FACT THAT DEF FLUID AGES TO THE POINT OF CAUSING THE VEHICLE TO GO INTO A LIMP MODE OF 5MPH WITH NO DISABLING THE LIMP MODE. UNSUSPECTING DIESEL OWNERS HAVE NO WAY OF KNOWING IF THE DEF THEY PURCHASED HAS EXPIRED OR THE DEF IN THEIR TANKS HAS GONE BAD. IF THE VEHICLE IS IN AN AREA THAT HAS DRASTIC CLIMATES SUCH AS SUB ZERO OR EXTREMELY HOT, DRIVER AND OCCUPANTS OF VEHICLE MAY DIE OF EXPOSURE. THERE IS NO WARNING FOR THE DEF FAILURE FOR IMPENDING FAILURE OF THE EMISSION SYSTEM AS I HAVE JUST EXPERIENCED. I BELIEVE THAT NOT MAKING NISSAN AND OTHERS TO NOT RECALL THIS DANGEROUS BUILT IN CHILD KILLER WOULD BE A TRAGIC MISTAKE BY THE SAFETY COMMISSIONS.



**16xdtitan**
Registered User 🇺🇸
Joined Aug 3, 2019
2 Posts

> leaper5 said: ⊕
>
> Not a good day with my 2017 Titan XD Pro (build 07/17) - 13,800 miles. Literally got this error as my family and I were backing out of the driveway this afternoon in Enid, OK to run to Colorado for weekend skiing. Called the dealer, and they told me to bring it in and they would check it out. They hooked it up and said it needed an update and would take 30-45 min. They finished the update and also asked where I was getting DEF. Since new, I have always purchased DEF at the diesel pumps. My last DEF fill was several weeks ago.
>
> ~~Got 30 miles out of town and the error returned. Then 10 minutes later, I got the 200 mile countdown. I called the~~
>
> Click to expand...

My 2016 XD just got the same warning light (DEF SYSTEM ERROR SEE DEALER). Took it to the dealer and I need a DEF pump which is not a warrantable item. In 2019 they replaced the long block (was under warranty) at 66k miles and now I'm at 70k miles and I have another major repair to make. I assume the transmission is next... I'm very disappointed with Nissan's QC department.

---



**Sean Lichty**
Registered User
Joined Nov 28, 2018
3 Posts

#4 · Nov 28, 2018 · ⋮

I received the same error last week, took it to the dealer and over $5k later they replaced the entire DEF system. Said something along the lines that the DEF I used was contaminated but since I showed the jug I bought they honoured it under warranty, not sure if that is true or not but that's what the service advisor told me. She made a passing comment that I am not the first they've seen and it happens often enough that they keep a complete DEF system in stock as they need them regularly.

2016 Pro-4X 5.0l

---



39. Indeed, the high failure rate and expenses associated with the DEF System Defect has resulted in a significant number of Class Vehicle owners choosing to disable the DEF system

altogether to avoid having to deal with it, as shown by the exchange below where one owner comments that "deleting" the DEF system is a better option than working through Nissan's warranty to address any issues:



40.    Not surprisingly, there is a significant aftermarket marketplace for the parts and engine tuning equipment needed to disable the DEF system on the Class Vehicles. *See, e.g.* https://dieselpowerup.com/nissan-titan-xd-5-0l-cummins-deletes-and-tuning-dpf-scr-and-egr/; https://dpfdeleteshop.com/collections/2016-2019-nissan-titan-xd-cummins-5-0.

41.    Critically, the DEF System Defect does not just impact the Class Vehicles' emissions, but it also creates a potentially dangerous situation as the Class Vehicles are programmed to go into "limp mode" that limits that vehicles' speed to just 5 mph. If the driver is unaware of the warning then the vehicle may come to a sudden halt in the middle of driving, creating a dangerous and potentially deadly situation.

42.    As shown by the above complaints, Defendant knew, or should have known, that the DEF System Defect and associated safety risk were material to owners and lessees of the Class Vehicles and were not known or reasonably discoverable by Plaintiffs and members of the Class

and Subclasses before they purchased or leased Class Vehicles, or before the warranties on their Class Vehicles expired.

43.     Notwithstanding Defendant's exclusive and superior knowledge of the DEF System Defect, Defendant failed to disclose the defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to sell the Class Vehicles. Defendant intentionally concealed the DEF System Defect and associated safety hazard, failed to provide any notice of the defect and associated safety hazard to Plaintiffs and members of the Class and Subclasses, and has failed to recall the vehicles to remedy the defect

**FACTUAL ALLEGATIONS WITH RESPECT TO LOSAPIO PLAINTIFFS**

44.     The Losapio Plaintiffs purchased a new 2017 Nissan XD with a Cummins 5.0-liter diesel engine at Fenton Nissan of Rockwall, located in Rockwall, Texas, in December 2017, for approximately $77,203.44.

45.     At the time of Plaintiffs' purchase, they also purchased an extended warranty which the finance manager told them, "Protects everything from bumper to bumper" excluding chips, dings, and dents.

46.     As part of their purchase, Plaintiffs received Defendant's Basic Limited Warranty and a copy of Defendant's Nissan Titan Owner's Manual.[4]

47.     In April of 2021, with approximately 13,900 miles on their vehicle, Plaintiffs had their vehicle serviced at Nissan of McKinney, Texas. At that service, the fuel and DEF filters were replaced, and the DEF fluid was refilled.

---

[4] A copy of Defendant's 2017 Nissan Titan Basic Limited Warranty is attached as <u>Exhibit B</u>.

48.     In late September 2021, while driving his vehicle, Plaintiff James Losapio, Jr., noticed a symbol on his instrument panel that he did not recognize. Plaintiff then returned home and opened the vehicle manual to discover that the warning light was for "Water in Fuel."

49.     Thereafter, Plaintiff James Losapio, Jr., called the dealership to determine how to fix the issue and brought his truck in for service. Plaintiff James Losapio, Jr., was later informed that DEF had contaminated the fuel system and begun to crystallize and that the repair would cost $23,648.89.

50.     Critically, the last time that the DEF fluid in Plaintiffs' vehicle was refilled was by the dealership during their prior service visit, and the "Water in Fuel" warning light appeared after 5 months had passed and Plaintiffs had driven approximately 1,800 miles—effectively giving Plaintiffs no ability to immediately try to remedy the issue before there was irreparable damage to Plaintiffs' vehicle that amounts to over 1/3 of the purchase price.

51.     Given that Plaintiffs purchased an additional "bumper to bumper" warranty beyond Defendant's new car warranty, Plaintiffs contacted Defendant's corporate representatives in an effort to have the repairs covered by the warranty they had purchased. However, Defendant refused to honor Plaintiffs' extended warranty and stated that fuel contamination was not covered under the warranty Plaintiffs had purchased.

52.     In addition to the damage caused to their vehicle as a result of the DEF Filler Defect, Plaintiffs, as well as other passengers in their vehicle, had on numerous occasions experienced the strong smell of diesel exhaust fumes in the vehicle's cabin.

53.     Indeed, on at least one occasion in December 2018 Plaintiffs complained of the diesel exhaust fumes in their vehicle to their dealership. However, Plaintiffs' service technician informed them that there was nothing wrong that they could find with the vehicle.

54.     At no point were Plaintiffs informed that there was a TSB released by Defendant to potentially address their complaints about the diesel exhaust fumes, nor to Plaintiffs' knowledge was the TSB ever applied to their vehicle.

55.      Had Plaintiffs known that Defendant's vehicle was defectively designed such that DEF fluid is easily inadvertently added to the fuel system and results in tens of thousands of dollars in damages and that they would frequently experience diesel exhaust fumes in the passenger cabin, Plaintiffs would not have purchased the vehicle, or would have at least paid significantly less for it than they did.

**FACTUAL ALLEGATIONS WITH RESPECT TO PLAINTIFF BIEWALD**

56.     In September 2019 Plaintiff Biewald purchased a certified pre-owned 2016 Nissan Titan XD with a Cummins 5.0-liter diesel engine and approximately 48,000 miles on the odometer at Marc Motors Nissan, located in Sanford, Maine, for approximately $39,000.

57.     As part of his purchase, Plaintiff received Defendant's Certified Pre-Owned ("CPO") warranty and a copy of Defendant's Nissan Titan Owner's Manual.

58.     Defendant's CPO warranty provides limited warranty coverage for 7 years or 100,000 miles from the vehicle's original in-service date.

59.     In November of 2021, with approximately 88,000 miles on his vehicle, Plaintiff Biewald's Nissan Titan displayed an error message on his dashboard indicating that the DEF System had malfunctioned and that the vehicle would go into limp mode within a short period of driving.

60.     Plaintiff immediately drove the vehicle to Marc Motors Nissan where he purchased it to have the vehicle diagnosed. At the dealership Plaintiff was told that the DEF system on his vehicle had failed and that it would require at least $9,000 to repair his vehicle, which he was

informed would entail replacement of the DEF converted assembly as well as the catalytic converter assembly.

61.     Critically, even though Defendant's vehicle was within the CPO warranty period as it had been less than 7 years since the vehicle's in-service date and less than 100,000 miles, the dealership refused to repair Plaintiff's vehicle under Defendant's warranty.

62.     Because Plaintiff did not have such a large amount of funds immediately available to perform the repair, he inquired with the dealership whether he can safely drive it home and was told that it would be safe to do so. However, on the drive home from the dealership Plaintiff's vehicle developed a significant and severe "knock," indicating that the DEF System Defect had also caused some kind of damage to the vehicle's engine.

63.     Plaintiff contacted the dealership once again and informed them about the newly developed engine noise and was again told that none of the issues he had experienced were covered under the vehicle's warranty.

64.     In addition to the damage caused to his vehicle as a result of the DEF System Defect, Plaintiff, as well as other passengers in his vehicle, had on numerous occasions experienced the strong smell of diesel exhaust fumes in the vehicle's cabin.

65.     Indeed, on at least one occasion in the summer of 2021 Plaintiff Biewald complained of the diesel exhaust fumes in his vehicle to his dealership. However, Plaintiff's service technician informed him that there was nothing wrong that they could find with the vehicle.

66.     At no point was Plaintiff informed that there was a TSB released by Defendant to potentially address the diesel exhaust fumes, nor to Plaintiff's knowledge was the TSB ever applied to his vehicle.

67.     Had Plaintiff known that Defendant's vehicle was defectively designed such that the DEF system would prematurely fail and result in thousands of dollars in damages and that he would frequently experience diesel exhaust fumes in the passenger cabin, Plaintiff would not have purchased the vehicle, or would have at least paid significantly less for it than he did.

## CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs bring this action individually and on behalf of all similarly situated persons as the Court may determine to be appropriate for class certification treatment, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b). Plaintiffs seek to represent the following Class and Subclasses of purchasers of 2016-2019 Nissan Titans equipped with Cummins 5.0-liter diesel engines (the "Class Vehicles"):

The Nationwide Class: All current and former owners and lessees of 2016–2019 Nissan Titan vehicles equipped with Cummins 5.0-liter diesel engines who purchased or leased the vehicle in the United States or its Territories.

The Texas Subclass: All current and former owners and lessees of 2016–2019 Nissan Titan vehicles equipped with Cummins 5.0-liter diesel engines who purchased or leased the vehicle in the state of Texas.

The Maine Subclass: All current and former owners and lessees of 2016–2019 Nissan Titan vehicles equipped with Cummins 5.0-liter diesel engines who purchased or leased the vehicle in the state of Maine.

69.     Excluded from the Class and Subclasses are: (i) Defendant and any entity or division in which Defendant has a controlling interest, as well as their legal representatives, officers, directors, assigns and successors; (ii) any judge to whom this case is assigned and the judge's clerks and any member of the judge's immediate family; and (iii) government purchasers and lessees.

70. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

71. Defendant manufactured thousands of vehicles containing the DEF Filler Defect, Diesel Fume Defect, and DEF System Defect during the relevant time period, and the Class and Subclasses are reasonably estimated to be in the thousands or tens of thousands such that joinder of all their members is impracticable. The precise number of members of the Class and Subclasses is unknown to Plaintiffs but can be ascertained through Defendant's records.

72. There is a well-defined community of interest in the relevant questions of law and fact affecting the putative members of the Class and Subclasses.

73. Common questions of law and fact predominate over any individual questions affecting the members of the Class and Subclasses, including, but not limited to, the following:

    a.    whether the Class Vehicles are defective;

    b.    whether Nissan misrepresented the standard, quality, and characteristics of the Class Vehicles;

    c.    whether Nissan knew Class Vehicles were equipped with defective exhaust/HVAC systems prior to Plaintiffs' and other Class members' purchases of their vehicles;

    d.    whether Nissan knew Class Vehicles were equipped with a defective fuel filling system prior to Plaintiffs' and other Class members' purchases of their vehicles;

    e.    whether Nissan knew Class Vehicles were equipped with a defective DEF system prior to Plaintiffs' and other Class members' purchases of their vehicles;

    f.    whether the defective nature of Class Vehicles' fuel filling, exhaust/HVAC, and DEF systems constitutes an unreasonable safety risk;

    g.    whether a reasonable consumer would have considered the fact that Class Vehicles were equipped with defective fuel filling, exhaust/HVAC, and

DEF systems to be important when deciding whether to purchase or lease a Class Vehicle;

h.　　　whether Nissan had a duty to disclose the defective nature of Class Vehicles' fuel filling, exhaust/HVAC, and DEF systems to Plaintiffs and other Class members;

i.　　　whether Nissan breached warranties with respect to the Class Vehicles;

j.　　　whether Nissan's refusal to perform the necessary repairs and replacement while under warranty constitutes deceptive and unfair conduct;

k.　　　whether Plaintiffs' and other Class members' Class Vehicles were worth less than as represented as a result of the conduct alleged herein;

l.　　　whether Plaintiffs and other Class members have been damaged and, if so, the extent of such damages; and

m.　　　whether Plaintiffs and other Class members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

74.　　　Defendant engaged in a common course of conduct giving rise to the legal rights Plaintiffs seek to enforce individually and on behalf of the other members of the Class and Subclasses. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if they exist, are outweighed in both quality and quantity by the numerous common questions that control this action.

75.　　　With respect to the putative Class and Subclasses, Plaintiffs' claims are typical of those of the absent members of the Class and Subclasses. If brought and prosecuted individually, the claims of each member of the Class and Subclasses would require proof of many of the same material and substantive facts and would rely upon the same remedial theories, seeking the same relief.

76.　　　Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class and Subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to

vigorously prosecuting this action on behalf of the other members of the Class and Subclasses and have the financial resources to do so. Neither Plaintiffs nor their counsel has any interest adverse to those of the other members of the Class or Subclasses.

77.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1), in that the prosecution of separate actions by individual members of the Class and Subclasses would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the parties opposing the Class and Subclasses. Such incompatible standards of conduct and varying adjudications on the same essential facts, proof, and legal theories would also create and allow the existence of inconsistent and incompatible rights within the Class and Subclassess.

78.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3), in that common questions of law and fact predominate over any questions affecting only individual members of the Class and Subclasses.

79.     Moreover, a class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

a.     Individual claims by the members of the Class and Subclasses would be impracticable, as the costs of pursuing such claims individually would exceed what any one Class or Subclasses member have at stake;

b.     Individual members of the Class and Subclasses are unlikely to have an interest in separately prosecuting and controlling any individual actions;

c.     The concentration of litigation of these common claims in one forum will achieve efficiency and promote judicial economy; and

d.     The proposed class action is manageable.

### <u>COUNT I</u>
**Breach of Implied Warranty of Merchantability**
**(on behalf of Plaintiffs and the proposed Class and Subclasses)**

80.     Plaintiffs reallege the foregoing allegations as if fully set forth herein.

81. Defendant is a merchant with respect to Class Vehicles and manufactured, distributed, warranted, and sold such Class Vehicles within the meaning of the Uniform Commercial Code.

82. With respect to leases, Defendant is and was at all relevant times a lessor of motor vehicles within the meaning of the Uniform Commercial Code.

83. The Class Vehicles are and were at all relevant times goods within the meaning of the Uniform Commercial Code.

84. Plaintiffs, as well as the other members of the Class and Subclasses, contracted with Nissan, through Defendant's agents, to purchase the Class Vehicles, and paid significant consideration in the form of the purchase or lease price for the Class Vehicles.

85. As a matter of law, each Class Vehicle comes with an implied warranty of merchantability whereby each vehicle is warranted by Nissan to be of merchantable quality such that it would pass without objection in the trade and is fit for the ordinary purposes for which they are used.

86. The ordinary purpose for which a consumer pickup truck is used is to safely transport individuals from one location to another.

87. However, Nissan breached this implied warranty of merchantability as Plaintiffs' vehicle, and the other members of the Class and Subclasses' Vehicles, are not fit for the ordinary purposes for which they are used and would not pass inspection as conforming goods within the trade because at the time they left the control of Nissan, and at the time of sale, the Class Vehicles suffered from the DEF Filler Defect, Diesel Fume Defect, and DEF System Defect such that they could not safely transport individuals from one location to another without those individuals being

25

exposed to hazardous and harmful diesel exhaust fumes and the dangers of a potential engine shutoff and failure.

88. Defendant's breach of warranty deprived Plaintiffs and the other members of the Class and Subclasses the benefit of their bargain because the Class Vehicles' ability to safely and properly function as a pickup truck was material to their decision to purchase the vehicle.

89. As a proximate and foreseeable result of Defendant's breach, Plaintiffs and the other members of the Class and Subclasses have and or/will sustain damages and loss. These damages include but are not limited to: the loss of value of the vehicle as a result of DEF Filler Defect, Exhaust Fume Defect, and DEF System Defect; expectation damages for Plaintiffs and the members of the Class and Subclasses because they did not obtain the benefit of the bargain they struck with Defendant; and any further damages that Plaintiffs and the other members of the Class and Subclasses have or will incur in order to remedy the defects.

**COUNT II**
**Breach of Implied Warranties under the Magnuson-Moss Warranty Act,**
**15 U.S.C. § 2301, *et seq.***
**(on behalf of Plaintiffs and the proposed Class and Subclasses)**

90. Plaintiffs reallege the foregoing allegations as if fully set forth herein.

91. Plaintiffs and the other members of the Class and Subclasses are "consumers" within the meaning of 15 U.S.C. § 2310(3).

92. Defendant is a "supplier" and "warrantor" within the meanings of sections 15 U.S.C. § 2301(4)–(5).

93. The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

94. 15 U.S.C. §2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with any implied warranty.

95. Plaintiffs, as well as the other Members of the Class and Subclasses, contracted with Defendant, through Defendant's authorized dealership agents, to purchase the Class Vehicles, and paid significant consideration in the form of the purchase price for the Class Vehicles.

96. Plaintiffs and the other Members of the Class and Subclasses directly relied on Defendant's warranties, representations, statements, and omissions concerning the Class Vehicles' fuel systems, DEF system, and exhaust/HVAC systems when choosing to purchase their Class Vehicles.

97. As a matter of law, each Class Vehicle comes with an implied warranty of merchantability whereby each vehicle is warranted by Nissan to be of merchantable quality such that it would pass without objection in the trade and is fit for the ordinary purposes for which they are used.

98. The ordinary purpose for which a consumer pickup truck is used is to safely transport individuals from one location to another.

99. However, Nissan breached this implied warranty of merchantability as Plaintiffs' vehicle, and the other members of the Class and Subclasses' Vehicles, are not fit for the ordinary purposes for which they are used and would not pass inspection as conforming goods within the trade because at the time they left the control of Nissan, and at the time of sale, the Class Vehicles suffered from the DEF Filler Defect, DEF System Defect, and Diesel Fume Defect such that they could not safely transport individuals from one location to another without those individuals being exposed to hazardous and harmful diesel exhaust fumes and the dangers of a potential engine shutoff and failure.

100.     Defendant's breach of warranty deprived Plaintiffs and the other members of the Class and Subclasses the benefit of their bargain because the Class Vehicles' ability to safely and properly function as a pickup truck was material to their decision to purchase the vehicle.

101.     Defendant has been afforded a reasonable opportunity to cure its breaches of implied warranties, including when Plaintiffs and other Class members brought their vehicles in for diagnostics, to complain about the effects of the DEF Filler Defect, Exhaust Fume Defect, and DEF System Defect, and to warn Defendant of the dangers posed to them and the public by the Defects.

102.     Additionally, Defendant has had actual notice of the DEF Filler Defect, Diesel Fume Defect, and DEF System Defect since at least 2018. Defendant received actual knowledge of Plaintiffs' warranty claims when they brought their Class Vehicles to Defendant's authorized dealerships in 2018, October 2021, and November 2021. In addition, Defendant has learned of the defects through consumer complaints, knowledge of the design and manufacturing of the fuel and exhaust/DEF/HVAC systems, internal product testing, and past experience. The existence and ubiquity of the defects is illustrated by the numerous publicized consumer complaints, disputes, and failed remedial measures. Furthermore, Defendant's issuance of TSBs directed to address the DEF Filler Defect, DEF System Defect, and Diesel Fume Defect shows actual knowledge.

103.     As a proximate and foreseeable result of Defendant's breach, Plaintiffs and the other members of the Class and Subclasses have and or/will sustain damages and loss. These damages include but are not limited to: the loss of value of the vehicle as a result of the DEF Filler Defect, Exhaust Fume Defect, and DEF System Defect; expectation damages for Plaintiffs and the members of the Class and Subclasses because they did not obtain the benefit of the bargain they

struck with Defendant; and any further damages that Plaintiffs and the other members of the Class and Subclasses have or will incur in order to remedy the defects.

## COUNT III
### Breach of Express Warranty
### (on behalf of Plaintiffs and the proposed Class and Subclasses)

104.    Plaintiffs reallege the foregoing allegations as if fully set forth herein.

105.    Plaintiffs and the other member of the Class and Subclasses formed a contract with Defendant at the time they purchased their Class Vehicles. The terms of the contract include the promises and affirmations of fact and express warranties made by Defendant.

106.    At the time of their purchase of their Class Vehicle, Plaintiffs received certain express warranties from Defendant, including express warranties featured in Defendant's Basic Limited Warranty for the Losapio Plaintiffs, Defendant's CPO Limited Warranty for Plaintiff Biewald, Owner's Manual, window stickers, and advertising brochure.[5]

107.    Plaintiffs' and the other members of the Class and Subclasses' Class Vehicles did not perform as promised and contained a defectively designed fuel filler system, DEF system, and exhaust/HVAC systems.

108.    Defendant advertises its 5-year 100,000-mile warranty as a bumper-to-bumper warranty and describes it as "America's best warranty."[6] Defendant's brochure for its 2017 Nissan Titan XD promises that Titan XD owners can ride with confidence, "And you ride with unmatched confidence, thanks to America's Best Truck Warranty." (Ex. C at 2).

---

[5] A copy of Defendant's 2017 Nissan Titan advertising brochure is attached as Exhibit C.
[6] https://web.archive.org/web/20170617083821/https://www.nissanusa.com/trucks/titan-xd.

109.    Defendant's Basic Limited Warranty provides that, "This warranty covers any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan." (Ex. B at 6).

110.    Defendant's Basic Limited Warranty similarly explains that "Warranty repairs will be made at no charge for parts and/or labor." The Limited Warranty provides that, to obtain a warranty service, "You must take the vehicle to an authorized Nissan dealer in the United States." (Ex. B. at 6).

111.    Defendant's CPO Limited Warranty extends its Basic Limited Warranty to 7-years 100,000 miles from the in-service date of the vehicle to cover any powertrain repairs. (https://cpo.nissanusa.com.modix.org/en/certified-pre-owned).

112.    Defendant's Owner's Manuals also provides that, "A NISSAN dealership knows your vehicle. When you require any service or have any questions, they will be glad to assist you with the extensive resources available to them."

113.    Nissan warranted that its 2016 Titan XD's passenger cabin was "smart" and "spacious"[7] and that its 2017 Titan XD's passenger cabin was "a huge step forward in comfort, quietness, and convenience" with its "premium features" and that the truck would "spoil you for anything." *Id.*

114.    Besides its Basic Warranty, these express warranties were also made in product literature supplied by Nissan, in advertisements, and in statements made on Nissan's website and by its salespersons. These affirmative statements and warranties of quality were part of the basis of the bargain between Nissan, on the one hand, and on the other hand Plaintiffs and the other members of the Class and Subclasses.

---

[7] A copy of Defendant's 2016 Nissan Titan advertising brochure is attached as Exhibit D.

115.     Defendant breached the written terms of its Basic Limited Warranty, described as America's Best Truck Warranty by Defendant, as well as its CPO Limited Warranty by failing to repair the DEF Filler Defect, DEF System Defect, and Diesel Exhaust Defect free of charge when Plaintiffs and other members of the Class and Subclasses followed the terms of the agreement by bringing the Class Vehicles to authorized Nissan dealers.

116.     Defendant further breached the terms of the express warranties with Plaintiffs and other members of the Class and Subclasses because the Class Vehicles did not conform to Defendant's representations. Specifically, Defendant failed to provide vehicles that were reliable, durable, comfortable, and convenient because the Class Vehicles suffer from defective fuel filling, DEF, and exhaust/HVAC systems that rendered the vehicles unreliable, increased the likelihood of engine failure, and exposed passengers to hazardous exhaust fumes that are anything but convenient.

117.     Defendant's breaches of its express warranties have deprived Plaintiffs and the other members of the Class and Subclasses of the benefit of their bargain. When they purchased their Class Vehicles, Plaintiffs and the other members of the Class and Subclasses understood Defendant's statements in its Basic Limited Warranty, CPO Limited Warranty, Owner's Manual, window stickers, and advertising materials to be accurate descriptions of the Class Vehicles' qualities and capabilities.

118.     On information and belief, Defendant has not suitably repaired the DEF Filler Defect, DEF System Defect, or Diesel Fume Defect free of charge for Plaintiffs and members of the Class and Subclasses despite the existence of the defects in the Class Vehicles at the time of their sale or lease and Defendant has failed to notify Plaintiffs and the other members of the Class

and Subclasses of the solutions for the Defects outlined in its TSBs or institute a recall for the Defective components.

119.     Defendant has actual knowledge that it breached express warranties with Plaintiffs and the other members of the Class and Subclasses related to the Class Vehicles through numerous NHTSA complaints, complaints made by Plaintiffs and the other members of the Class and Subclasses directly to Defendant, as well as through Defendant's internal testing.

120.     Defendant's unlawful conduct, as described above, was the foreseeable and actual cause of Plaintiffs and other members of the Class and Subclasses suffering actual damage on account of receiving a truck that lacked the performance and qualities that Defendant represented the vehicles to have and contained defective fuel, DEF, and exhaust/HVAC systems.

121.     Despite its knowledge of the DEF Filler Defect, DEF System Defect, and Diesel Fume Defect, Defendant has failed to honor its express warranties, failed to conform the Class Vehicles to its express warranties, has failed to adequately repair the defects in Plaintiffs' vehicle or in the Class Vehicles of the other members of the Class and Subclasses, and has failed to adequately notify Plaintiffs and members of the Class and Subclasses of the Defects and their solutions.

122.     Defendant has been afforded a reasonable opportunity to cure its breaches of written warranties, including when Plaintiffs and the other members of the Class and Subclasses brought their vehicles in for diagnostics, to complain about the effects of the Defects, and to warn Defendant of the dangers posed to them and the public by the effects of the Defects. The volume and content of the complaints received by Defendant put it on notice of the defects in the Class Vehicles obligating Defendant to provide warranty repairs

123.     As a direct and proximate result of Defendant's breach of the foregoing written warranties, Plaintiffs and the other members of the Class and Subclasses sustained damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiffs and the other members of the Class and Subclasses, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs and/or other relief as appropriate.

## COUNT IV
### Breach of Written Warranties under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* (on behalf of Plaintiffs and the proposed Class and Subclasses)

124.     Plaintiffs reallege the foregoing allegations as if fully set forth herein.

125.     Plaintiffs and the other members of the Class and Subclasses are "consumers" within the meaning of 15 U.S.C. § 2310(3).

126.     Defendant is a "supplier" and "warrantor" within the meanings of sections 15 U.S.C. § 2301(4)–(5).

127.     The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

128.     15 U.S.C. §2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with any written warranty.

129.     Defendant provided Plaintiffs and members of the Class and Subclasses with one or more express warranties, which are covered under 15 U.S.C. § 2301(6). Specifically, Defendant provided a 5 year or 100,000 miles "bumper-to-bumper" warranty which includes all components other than normal wear and maintenance items. Under this Basic Limited Warranty, described as America's Best Truck Warranty, Defendant promised to repair or replace covered defective components arising out of defects in materials and/or workmanship, at no cost to owners and

lessees of the Class Vehicles. In addition, Defendant provided a 7 year or 100,000 mile CPO powertrain warranty for purchasers of certified pre-owned vehicles like Plaintiff Biewald that promised to repair or replace defective components in the engine, transmission, and drivetrain arising out of defects in materials and/or workmanship. (*See* https://cpo.nissanusa.com/en/benefits/faq).

130.    Defendant's Basic Limited Warranty provides that, "This warranty covers any repairs needed to correct defects in materials or workmanship of all parts and components of each new Nissan vehicle supplied by Nissan." (Ex. B at 6).

131.    Defendant's Basic Limited Warranty similarly explains that "Warranty repairs will be made at no charge for parts and/or labor." The Limited Warranty provides that, to obtain a warranty service, "You must take the vehicle to an authorized Nissan dealer in the United States." (Ex. B. at 6). Defendant's CPO Limited Warranty similar states that the warranty covers any repairs for "over 600 components including engine, transmission and drive train" subject to a $100 deductible.

132.    However, in breach of these warranties Defendant failed to repair the DEF Filler Defect, DEF System Defect, or Exhaust Fume Defect in Plaintiffs' and the other members of the Class and Subclasses' vehicles free of charge as Defendant promised.

133.    Accordingly, Defendant's Basic Limited Warranty and CPO Limited Warranty are deceptive because they fail to accurately state what Defendant will do in the event of a defect, as required by 16 C.F.R. § 701.3(a)(3).

134.    It was a basis of the bargain between Plaintiffs and the other members of the Class and Subclasses that Defendant would provide warranty repairs, such that as a result of Defendant's

deception Plaintiffs and the other Members of the Class and Subclasses have overpaid for their Class Vehicles.

135.    Further, Defendant's statements concerning the Class Vehicles' qualities and capabilities made in its advertising materials are "written warrant[ies]" within the meaning of 15 U.S.C. § 2301(6), because they are written affirmations of fact that certain Class Vehicle components are defect free and/or will meet a specified level of performance over a specified time period.

136.    Nissan expressly warranted through its brochures that the Class Vehicles had massive capabilities" and that "It all adds up to strength, durability, and reliability you can count on for years to come." (Ex. C at 3; Ex. D at 3).

137.    Nissan's brochure further warranted that its 2016 Titan XD's passenger cabin was "smart" and "spacious"[8] and that its 2017 Titan XD's passenger cabin was "a huge step forward in comfort, quietness, and convenience" with its "premium features" and that the truck would "spoil you for anything." *Id*

138.    These express warranties were also made in product literature supplied by Nissan, in advertisements, and in statements made on Nissan's website and by its salespersons. These affirmative statements and warranties of quality were part of the basis of the bargain between Nissan, on the one hand, and on the other hand Plaintiffs and the other members of the Class and Subclasses.

139.    Defendant breached the terms of the express warranties with Plaintiffs and other members of the Class and Subclasses because the Class Vehicles did not conform to Defendant's representations. Specifically, Defendant failed to provide vehicles that were reliable, durable,

---

[8] A copy of Defendant's 2016 Nissan Titan advertising brochure is attached as <u>Exhibit D</u>.

comfortable, and convenient because the Class Vehicles suffer from defective fuel filling and exhaust/HVAC systems that render the vehicles unreliable, increase the likelihood of engine failure, and expose passengers to hazardous exhaust fumes that are anything but convenient.

140. As alleged herein, Defendant breached these warranties by failing to repair the DEF Filler Defect, DEF System Defect, and Diesel Fume Defect in Plaintiffs' and other members of the Class and Subclasses' Vehicles after Defendant was made aware of the defects, by failing to notify Plaintiffs and the other members of the Class and Subclasses of any repair or solution for the defects, and by providing Class Vehicles that did not conform to the statements of fact and quality that Defendant advertised.

141. Plaintiffs, as well as the other members of the Class and Subclasses, contracted with Defendant, through Defendant's authorized dealership agents, to purchase the Class Vehicles, and paid significant consideration in the form of the purchase price for the Class Vehicles.

142. In purchasing their Class Vehicles, Plaintiffs and the other members of the Class and Subclasses dealt with Defendant directly, as Defendant authored the representations in its advertising and that were provided by salespersons who sold the Class Vehicles and Defendant provided the express warranties applicable to the Class Vehicles.

143. Plaintiffs and the other members of the Class and Subclasses directly relied on Defendant's warranties, representations, statements, and omissions concerning the Class Vehicles' fuel filling, DEF, and exhaust/HVAC systems when choosing to purchase their Class Vehicles.

144. Defendant's breaches of its express warranties have deprived Plaintiffs and the other members of the Class and Subclasses of the benefit of their bargain. When they purchased their Class Vehicles, Plaintiffs and the other members of the Class and Subclasses understood Defendant's statements in its Basic Limited Warranty, CPO Limited Warranty, Owner's Manual,

window stickers, and advertising materials to be accurate descriptions of the Class Vehicles' qualities and capabilities.

145.     Defendant has been afforded a reasonable opportunity to cure its breaches of express warranties, including when Plaintiffs and the other members of the Class and Subclasses brought their vehicles in for diagnostics, to complain about the effects of the DEF Filler Defect, DEF System Defect, Diesel Fume Defect, and to warn Defendant of the dangers posed to them and the public by the effects of these defects.

146.     Defendant's warranty disclaimers, exclusions and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known defect. Defendant knew when it first made these warranties and their limitations that the defects existed, and that the warranties might expire before a reasonable consumer would notice or observe the defects. Defendant also failed to take necessary actions to adequately disclose or cure the defects after the existence of the defects came to the public's attention and sat on its reasonable opportunity to cure or remedy the defects, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the defects or cure its breaches of warranty.

147.     Despite its knowledge of the defects, Defendant failed to notify Plaintiffs and the other members of the Class and Subclasses of the DEF Filler Defect, DEF System Defect, or the Diesel Fume Defect and failed to provide an adequate repair for the defects. Defendant issued TSBs throughout Plaintiffs' ownership of their Class Vehicle but did not directly notify Plaintiffs and the other members of the Class and Subclasses of the defects and failed to adequately notify its authorized dealerships and service centers.

148.     Defendant has actual knowledge that it breached express warranties with Plaintiffs and the other members of the Class and Subclasses related to the Class Vehicles through numerous NHTSA complaints, complaints made by Plaintiffs and the other members of the Class and Subclasses directly to Defendant, as well as through Defendant's internal testing.

149.     As a direct and proximate result of Defendant's breaches of the foregoing written warranties, Plaintiffs and the other members of the Class and Subclasses sustained damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiffs and the other members of the Class and Subclasses, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, including statutory attorneys' fees, and/or other relief as appropriate.

### COUNT V
**Unjust Enrichment**
**(on behalf of Plaintiffs and the proposed Class and Subclasses)**

150.     Plaintiffs reallege the foregoing allegations as if fully set forth herein.

151.     As a direct and proximate result of its failure to disclose known defects, Nissan has unjustly profited through the sale and lease of Class Vehicles as Plaintiffs and the other members of the Class and Subclasses would not have purchased the vehicles or would have paid less for them had they been made aware of the defects. Although these vehicles are purchased through Nissan's agents, the money from the vehicle sales flows directly back to Nissan, which receives an unjust, substantial benefit.

152.     As a direct and proximate result of its failure to disclose known defects in Class Vehicles, Nissan also profited, at Plaintiffs and the other members of the Class and Subclasses' expense, from repeated and necessary high-cost repairs that similarly confer an unjust, substantial benefit on Nissan through part sales and proprietary diagnostic tools.

38

153. Nissan has been unjustly enriched due to the known defects in Class Vehicles through money paid that earned interest or otherwise added to Nissan's profits when it should have remained with Plaintiffs and the other members of the Class and Subclasses.

154. As a result of the Nissan's unjust enrichment, Plaintiffs and the other members of the Class and Subclasses have suffered damages.

**COUNT VI**
**Violation of the Texas Deceptive Trade Practices Act,**
**Tex. Bus. & Com. Code § 17.41, *et seq.***
**(on behalf of the Losapio Plaintiffs and the proposed Texas Subclass)**

155. The Losapio Plaintiffs reallege the foregoing allegations as if fully set forth herein.

156. The Losapio Plaintiffs and the other Texas Subclass members are "consumers" under Tex. Bus. & Com. Code § 17.45(4).

157. Defendant is a "person," under Tex. Bus. & Com. Code § 17.45(3).

158. Defendant's conduct, as described herein, in advertising and selling the Class Vehicles to the Losapio Plaintiffs and the other Texas Subclass Members without disclosing and repairing the DEF Filler Defect, DEF System Defect, and Diesel Fume Defect violates the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code § 17.41, *et seq*.

159. Specifically, Defendant violated the TDPA by selling Class Vehicles that it knew were equipped with defectively designed fuel filler, DEF, and exhaust/HVAC systems that were incapable of performing as advertised, unable to deliver the benefits, qualities, and characteristics described in Defendant's advertisements and promotional materials, and which created a significant risk of or resulted in premature engine failure, exposed passengers to harmful diesel exhaust fumes and the associated health risks, and expose the public to an unreasonable safety risk.

160. Furthermore, Defendant violated the TDPA when it omitted material facts about the Class Vehicles that they had defectively designed fuel filler, DEF, and exhaust/HVAC systems

which a reasonable consumer would consider these facts important when selecting a vehicle to purchase or lease.

161. As evidenced by Defendant's TSB's and the numerous complaints publicly submitted to Defendant, Defendant knew that the Class Vehicles had defectively designed fuel filler, DEF, and exhaust/HVAC systems in the ways described above when it sold the Losapio Plaintiffs and the other Texas Subclass Members the Class Vehicles, and that the defective fuel filler, DEF, and exhaust/HVAC systems substantially diminished the quality, performance, and lifespan of their vehicles.

162. Nissan received Notice of the Losapio Plaintiffs' claims under the TDPA regarding the DEF Filler Defect and Diesel Fume Defect when Plaintiffs brought their vehicle to Nissan of McKinney, an authorized Nissan dealership, to repair the Diesel Fume Defect and damages caused by the DEF Filler Defect, and subsequently asked Defendant itself to repair the damages caused to their vehicle due to the DEF Filler Defect pursuant to the warranties issued by Defendant.

163. Defendant's unfair and deceptive acts or practices were the foreseeable and actual cause of the Losapio Plaintiffs and other Texas Subclass Members suffering actual damages as a result of receiving vehicles that lacked the performance and features that Nissan represented the vehicles to have due to the defectively designed fuel filler, DEF, and exhaust/HVAC systems

164. The Losapio Plaintiffs and the other Texas Subclass members paid for a truck that was supposed to meet certain specifications. When they received a vehicle that did not conform to these specifications and which fell below the standards set by and described in Nissan's representations, the Losapio Plaintiffs and the other Texas Subclass Members were damaged on account of receiving a truck worth less than represented. The Losapio Plaintiffs and the other Texas Subclass Members suffered diminution in the value of Class Vehicles, out-of-pocket losses related

to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

165. The Losapio Plaintiffs, individually and on behalf of the other members of the Texas Subclass, seek a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to extend repair and replacement remedies to all of the Texas Subclass Members who experience premature engine failure or exposure to diesel exhaust fumes while driving their vehicles.

## COUNT VII
### Violation of the Maine Unfair Trade Practices Act, Me. Rev. Stat. Tit. 5, § 207 (on behalf of Plaintiff Biewald and the proposed Maine Subclass)

164. Plaintiff Biewald realleges the foregoing allegations as if fully set forth herein.

165. The Maine Unfair Trade Practices Act ("MUTPA") provides that "unfair or deceptive acts or practices in conduct of any . . . commerce are declared unlawful." Me. Rev. Stat. tit. 5, § 207.

166. Defendant's conduct, as described herein, in advertising and selling the Class Vehicles to the Plaintiff Biewald and the other Maine Subclass Members without disclosing and repairing the DEF Filler Defect, DEF System Defect, and Diesel Fume Defect violates the MUTPA, Me. Rev. Stat. Tit. 5, § 207.

167. Specifically, Defendant violated the MUTPA by selling Class Vehicles that it knew were equipped with defectively designed fuel filler, DEF, and exhaust/HVAC systems that were incapable of performing as advertised, unable to deliver the benefits, qualities, and characteristics described in Defendant's advertisements and promotional materials, and which created a

significant risk of or resulted in premature engine failure, exposed passengers to harmful diesel exhaust fumes and the associated health risks, and expose the public to an unreasonable safety risk.

168.    Furthermore, Defendant violated the MUTPA when it omitted material facts about the Class Vehicles that they had defectively designed fuel filler, DEF, and exhaust/HVAC systems which a reasonable consumer would consider these facts important when selecting a vehicle to purchase or lease.

169.    As evidenced by Defendant's TSB's and the numerous complaints publicly submitted to Defendant, Defendant knew that the Class Vehicles had defectively designed fuel filler, DEF, and exhaust/HVAC systems in the ways described above when it sold to Plaintiff Biewald and the other Maine Subclass Members the Class Vehicles, and that the defective fuel filler, DEF, and exhaust/HVAC systems substantially diminished the quality, performance, and lifespan of their vehicles.

170.    Nissan received Notice of the Plaintiff Biewald's claims under the MUTPA regarding the DEF System Defect and Diesel Fume Defect when Plaintiff brought his vehicle to Marc Motors Nissan, an authorized Nissan dealership, to repair the Diesel Fume Defect and damages caused by the DEF System Defect, and subsequently asked Defendant to repair the damages caused to his vehicle pursuant to the warranties issued by Defendant.

171.    Defendant's unfair and deceptive acts or practices were the foreseeable and actual cause of the Plaintiff Biewald's and the other Maine Subclass Members suffering actual damages as a result of receiving vehicles that lacked the performance and features that Nissan represented the vehicles to have due to the defectively designed fuel filler, DEF, and exhaust/HVAC systems

172.    Plaintiff Biewald and the other Maine Subclass members paid for a truck that was supposed to meet certain specifications. When they received a vehicle that did not conform to these

specifications and which fell below the standards set by and described in Nissan's representations, Plaintiff Biewald and the other Maine Subclass Members were damaged on account of receiving a truck worth less than represented. Plaintiff Biewald and the other Maine Subclass Members suffered diminution in the value of Class Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Class Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

173.    Plaintiff Biewald, individually and on behalf of the other members of the Maine Subclass, seek a Court order enjoining the above-described wrongful acts and practices of Defendant, ordering Defendant to extend repair and replacement remedies to all of the Maine Subclass Members who experience premature engine failure or exposure to diesel exhaust fumes while driving their vehicles.

WHEREFORE, for the reasons set forth above, Plaintiffs, individually and on behalf of similarly situated individuals, request relief and judgment against Defendant as follows:

a.    An Order certifying the Class and Subclasses as defined above;

b.    An award of actual and compensatory damages to Plaintiffs and the other members of the Class and Subclasses for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

c.    An award of punitive damages for Defendant's misconduct and deliberate indifference to catastrophic injury risks;

d.    An award of reasonable attorneys' fees and costs;

e. An Order enjoining Defendant from continuing to sell vehicles containing the DEF Filler Defect, DEF System Defect, and Diesel Fume Defect without disclosing the Class Vehicles' defects; and

f. Such further and other relief as the Court deems reasonable and just.

## JURY DEMAND

Plaintiffs hereby demands trial by jury on all claims and issues so triable.

Dated: May 23, 2022

Respectfully submitted,

JAMES LOSAPIO, KATHLEEN B. LOSAPIO, and PAUL BIEWALD, individually and on behalf of similarly situated individuals

By: */s/J. Luke Sanderson*
J. Luke Sanderson
Wampler, Carroll, Wilson & Sanderson, P.C.
208 Adams Ave.
Memphis, TN 38103
Tel: (901) 523-1844


*/s/Eugene Y. Turin*
Eugene Y. Turin (admitted *pro hac vice*)
Steven R. Beckham (admitted *pro hac vice*)
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, Illinois 60601
Tel: (312) 893-7002
mmcguire@mcgpc.com
eturin@mcgpc.com
sbeckham@mcgpc.com

*Attorneys for Plaintiffs and the proposed Class and Subclasses*